## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| Commonwealth of Puerto Rico, By Attorney General Domingo Emanuelli Hernández, | |
| Plaintiff, | |
| v. | Case No. ___3:23-cv-1410___ |
| Navient Corporation and Navient Solutions, LLC | |
| Defendants | |

### COMPLAINT FOR PERMANENT INJUNCTION AND OTHER RELIEF

**NOW INTO COURT**, through undersigned counsel, comes the Commonwealth of Puerto Rico, on behalf of itself and as *parens patriae* on behalf of the population of Puerto Rico, by Attorney General Domingo Emanuelli Hernández (the "Commonwealth") and brings this action against Navient Corporation and Navient Solutions, LLC (collectively, the "Defendants" or "Navient") and avers as follows:

### INTRODUCTION

1.      The Commonwealth brings this action to prevent unfair, deceptive, or abusive acts or practices pursuant to the Attorney General's statutory authority under 10 L.P.R.A. § 259 (the "Fair Competition Act") and 3 L.P.R.A. § 341 (the "Puerto Rico Consumer Protection Act"), to enforce Puerto Rico's laws prohibiting unfair methods of competition and unfair or deceptive acts or practices in trade or commerce and under the Consumer Financial Protection Act of 2010 (the "CFPA"), 12 U.S.C. §§ 5531, 5536, 5552(a).

2.      Navient, formerly known as Sallie Mae, Inc., is the largest student loan servicer in the United States. Prior to the cessation of its federal student loan servicing business in 2021, Navient serviced the loans of more than 12 million borrowers, and its portfolio included more than $300 billion in federal and private student loans.

3.      At all times relevant hereto, Defendants engaged in trade and commerce in Puerto Rico by offering, selling, marketing, and promoting student loans to borrowers in Puerto Rico and by servicing and collecting on those borrowers' student loans.

4.      Defendants have engaged in practices that have harmed and continue to harm countless student loan borrowers in Puerto Rico by: (a) promoting risky and expensive subprime loans that they knew or should have known were likely to default; and (b) failing to perform core servicing duties, both actions causing harm to borrowers and cosigners.

5.      Defendants are using, have used, or are about to use methods, acts, or practices declared unlawful by the Fair Competition Act and/or Section 1036 of the CFPA.

6.      The CFPA, which prohibits "unfair, deceptive or abusive acts or practices," explicitly delegates to state attorneys general the authority to bring federal civil enforcement actions to enforce the CFPA and to secure remedies provided therein. 12 U.S.C. § 5552(a)(1). The CFPA requires that an attorney general provide notice to the Consumer Financial Protection Bureau ("CFPB") of the action. 12 U.S.C. § 5552(b). The Commonwealth has provided notice pursuant to that provision.

7.      Sections 1031 and 1036 of the CFPA prohibit a "covered person" from committing or engaging in any "unfair, deceptive, or abusive act or practice" in connection with any transaction with a borrower for a consumer financial product or service, or the offering of a consumer financial

product or service." 12 U.S.C. §§ 5531(a), 5536(a)(1)(B). Defendants are "covered person[s]" within the meaning of the CFPA. 12 U.S.C. § 5481(6).

8.     An act or practice is unfair if it causes or is likely to cause substantial injury to consumers, which substantial injury is not reasonably avoidable by consumers, and such substantial injury is not outweighed by countervailing benefits to consumers or to competition. 12 U.S.C. § 5531(c). A representation is deceptive if: (1) it misleads or is likely to mislead the borrower; (2) the borrower's interpretation of the representation is reasonable under the circumstances; and (3) the misleading representation is material. An act or practice is abusive if it interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service or takes unreasonable advantage of: (a) a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service; (b) the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service; or (c) the reasonable reliance by the consumer on a covered person to act in the interests of the consumer. 12 U.S.C. § 5531(d).

9.     The CFPA empowers this Court to grant any appropriate legal or equitable relief with respect to violations of Federal consumer financial law, including, without limitation, a permanent or temporary injunction, rescission or reformation of contracts, the refund of moneys paid, restitution, disgorgement or compensation for unjust enrichment, and payment of damages or other monetary relief. 12 U.S.C. § 5565. The Commonwealth believes that, after a reasonable opportunity for discovery, the evidence will likely show that Defendants knowingly violated Federal consumer financial law when they engaged in the acts and practices described herein.

10.     The public interest is served by seeking before this Honorable Court a permanent injunction to restrain the methods, acts, and practices alleged, including restitution and

disgorgement of all income and monies Defendants have derived from these methods, acts and practices, and investigative and litigation costs.

11.    The Commonwealth believes that citizens of the Commonwealth are suffering and will continue to suffer harm unless the Court permanently enjoins the acts and practices of Defendants complained of herein.

12.    This Complaint is based upon information and belief and the Commonwealth's investigation into Navient's servicing violations to determine its impact on Puerto Rican borrowers, which includes information that is publicly filed. The Commonwealth's investigation is ongoing, and the Commonwealth reserves its right to amend this Complaint based on new information it may discover.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction pursuant to 12 U.S.C. § 5565(a)(1), 28 U.S.C. § 1331, and 12 U.S.C. § 5552(a)(1). This case is brought under Federal consumer financial law, 12 U.S.C. § 5565(a)(1), and is brought by the Attorney General of Puerto Rico in a "district court of the United States in that State . . . to enforce provisions of the" CFPA, 12 U.S.C. § 5552(a)(1).

14.    The Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

15.    Venue is proper in this district because Defendants are located, reside, and/or do business in this district, and/or a substantial part of the events or omissions giving rise to the claims occurred in this district. 28 U.S.C. § 1391(b), (c); 12 U.S.C. § 5564(f).

## PARTIES

16.    Plaintiff is the Commonwealth of Puerto Rico, on behalf of itself and as *parens patriae* on behalf of the population of Puerto Rico, acting through the Attorney General Domingo Emanuelli Hernández, with offices located at 685 Av. Tte. César Luis González, San Juan, Puerto Rico 00918.

17.    Defendant Navient Corporation is a Delaware corporation with its principal executive offices located at 123 Justison Street, Wilmington, DE 19801. Navient Corporation has not properly filed to obtain authorization to do business in Puerto Rico.

18.    Defendant Navient Solutions, LLC, formerly known as Navient Solutions, Inc., is a Delaware limited liability company with its principal executive offices located at 123 Justison Street, Wilmington, DE 19801Navient Solutions, LLC has not properly filed to obtain authorization to do business in Puerto Rico.

## BACKGROUND

### I.    Defendants' Corporate Background

19.    Defendants Navient Corporation and Navient Solutions, LLC have two corporate predecessors: a parent company (SLM Corporation) and a subsidiary (Sallie Mae, Inc.).

20.    From 2004 until April 2014, SLM Corporation and its subsidiaries, including Sallie Mae Bank, engaged in the full spectrum of student lending business activities, including federal and private loan origination, marketing student loans and loan packages to schools and student borrowers, and servicing and collecting loans, all under one corporate umbrella.

21.    In April 2014, Defendants Navient Corporation and Navient Solutions, LLC assumed the liabilities of their predecessors, SLM Corporation and Sallie Mae, Inc. Defendants also took over their predecessors' servicing business. Defendant Navient Solutions, LLC took over

the servicing business. Defendant Navient Corporation assumed responsibility for liabilities resulting from pre-split conduct of SLM Corporation and its subsidiaries, Sallie Mae, Inc. and Sallie Mae Bank. Included in the liabilities assumed by Defendant Navient Corporation is the loan origination and servicing conduct described in this Complaint.

22.     There is significant overlap between the corporate governance and management of Navient Corporation and Navient Solutions, LLC. Specifically, many of the directors and officers of Navient Solutions, LLC have also been directors or officers of Navient Corporation. For example, John Remondi serves as President and CEO for both Navient Corporation and Navient Solutions, LLC; John Kane serves as Group Resident, Business Processing Solutions and previously served as Chief Operating Officer for both Navient Corporation and Navient Solutions, LLC; Somsak Chivavibul serves as Chief Decision Management Officer and previously served as Chief Financial Officer for both Navient Corporation and Navient Solutions, LLC; and Timothy Hynes serves as Executive Vice President of Consumer Lending and previously served as Chief Risk Officer for both Navient Corporation and Navient Solutions, LLC.

23.     Navient Corporation controls and directs hiring of employees for its subsidiaries, including Navient Solutions, LLC.

24.     Navient Corporation not only directs and controls Navient Solutions, LLC, but often makes no meaningful distinction between Navient Corporation and its subsidiaries. It instead refers collectively to the entities as "Navient."

25.     Navient Corporation consented to, has knowledge of, has materially participated in, and/or has controlled the activities of Navient Solutions, LLC with respect to the conduct alleged in this Complaint.

26.     Unless otherwise specified herein, whenever reference is made in this complaint to any act of a Defendant, such allegations shall be deemed to mean the act of a Defendant acting individually, jointly, severally, or in concert with other Defendants.

## II.    Federal Student Loans

27.     As used in this Complaint, "federal student loans" are those loans funded or guaranteed by the federal government.

28.     Federal student loans carry certain characteristics unique from most other loan products, including, but not limited to: (1) they are primarily need-based and made to borrowers regardless of creditworthiness – approval is automatic if the student meets program requirements; (2) the interest rate is capped by the federal government; (3) the loans are generally nondischargeable in bankruptcy; and (4) they present a variety of repayment options available to borrowers, including options based on the borrower's income.

29.     Because federal student loans have lower interest rates and better repayment options, borrowers typically obtain federal loans before private loans.

30.     Until 2010, federal student loans were originated and funded by private lenders such as Defendants, and guaranty agencies insured those funds, which were reinsured by the government pursuant to the Federal Family Education Loan Program ("FFELP").

31.     In 1994, through the enactment of the Direct Loan Program, the federal government began originating loans directly to borrowers, eliminating private middlemen.

32.     Regardless of the type of federal student loan a borrower has, and no matter the channel by which the government provided the loan to the borrower, the management or "servicing" of federal student loans is administered by private entities, such as Defendants.

33.     After student borrowers leave school, they may be unable to meet their monthly payment obligation under the original terms of their loan. Unlike with other private debts, bankruptcy will generally not offer any practical relief for student borrowers who cannot make their student loan debt payments. In these instances, federal student loans come with an array of repayment options to fit a borrower's short-term and long-term goals, including some repayment plans that cap the monthly payments based on the borrower's income.

34.     Federal student loan servicers handle several issues for borrowers, including: collecting payments, providing repayment options to borrowers, facilitating the loan's payoff, and collecting on delinquent loans.[1]

35.     Although federal student loans offer borrowers significant advantages, there are significant consequences to borrowers who default. For example, their wages may be garnished without a court order and their social security or income tax refunds may be subject to offset.

### III.     Private Student Loans

36.     Servicers, such as Defendants, also service private student loans.

37.     Unlike federal student loans, private student loans are not tied to, or guaranteed by, the federal government. Private student loans are made by private institutions and are often used to cover the gap between the full cost of education and the total federal aid available to a student borrower.

38.     Private institutions extend private student loans to borrowers based on the lenders' assessments of the borrowers' creditworthiness and likelihood of loan repayment. Private student loan lenders have to more fully evaluate a potential borrower's likelihood of repaying a loan because the loans are not guaranteed by the federal government.

---

[1] Since March 2020, there have been no collections on federally-held student loans, but that is set to end in September of 2023, with collections to resume in October 2023.

39.     Private student loans are almost always more expensive and carry higher interest rates when compared to federal loans. In contrast to the federal student loan interest rates set by Congress, private student loan interest rates fluctuate based on financial indexes such as the Prime rate or LIBOR, and many private loans come with variable rather than fixed interest rates.

40.     Because many student borrowers have very limited credit histories, many private student lenders require borrowers to obtain a creditworthy cosigner who is equally responsible for repaying the loan.

41.     In some cases, after they leave school, private student loan borrowers struggle to meet their monthly payment amounts. Unlike federal loans, however, there are no standard repayment plan options for private student loan borrowers. Instead, if a borrower is offered a repayment plan, it is at the discretion of the servicer, sometimes with parameters set by the lender or current owner of the debt pursuant to a servicing contract.

42.     Because private student loans are more expensive and lack many of the protections of federal student loans – such as income-driven repayment programs ("IDR") – a federal student loan and private student loan to the same individual may have markedly different impacts on that borrower's budget, credit score, and financial life. Particularly for borrowers struggling to make ends meet, federal student loans can often be made manageable through IDR plans, while defaulting on private student loans lacking these protective features can have devastating consequences.

43.     Even though private student loans share many features with credit card debt and other unsecured credit products in the marketplace, since the passage of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, many of these loans cannot be discharged in bankruptcy.

## FACTUAL ALLEGATIONS

### I.    Loan Origination

44.    As far back as 2004, SLM Corporation, acting through its subsidiaries, Sallie Mae, Inc. and Sallie Mae Bank, originated both FFELP and private student loans nationwide, including in Puerto Rico.

45.    Liability for practices relating to the origination of these loans was transferred to Navient Corporation and/or its subsidiaries as part of the 2014 corporate split. While most of the alleged origination conduct occurred when Defendants were known as SLM Corporation and Sallie Mae, Inc., for clarity, this Complaint attributes such conduct to Defendants because they assumed these liabilities.

46.    Defendants held themselves out as trusted resources for students who needed some help to advance their economic position in life but, in reality, borrowers were never told that the private loans Defendants originated were likely to default.

47.    While Defendants have had the benefit of utilizing accounting practices to write-off these loans as a business expense, countless borrowers, including many in Puerto Rico, are struggling to repay these debts.

### A.  Preferred Lending

48.    Until approximately 2007, many school financial aid offices maintained a list of "preferred lenders" to provide guidance to students who had to choose between the different lenders offering federal and private student loans.

49.    In 2008, with the passage of the Higher Education Opportunity Act of 2008, new regulations were imposed on preferred lending due to the many known and unmanaged conflicts of interest of the financial aid offices.

50. Before those regulations were imposed on preferred lending, students typically borrowed from lenders on the preferred lender lists, reasonably assuming that such lists represented the endorsement or wisdom of the financial aid office.

51. Upon information and belief, the lenders listed on a school's preferred lender lists typically received in aggregate up to 90% of the loans taken out by the institution's students and their parents, giving the preferred lenders exclusive or near-exclusive access to a school's population of borrowers. Defendants therefore sought to establish themselves at the top of the preferred lending lists in order to obtain nearly exclusive access to schools' borrowers.

52. To become a preferred lender, Defendants created custom packages of loans that they marketed to schools.

53. These packages consisted of a variety of loan products including: FFELP loans; private loans for borrowers who qualified for Defendants' standard private student loan products ("prime loans"); and private loans for borrowers who were ineligible for Defendants' standard private student loan products ("subprime loans"). These "packages" allowed schools to enroll more students – i.e., the students who would not have ordinarily qualified for standard loan products to cover the "gap" between the available federal student loans and the total cost of attendance, and who therefore would not have been able to enroll but for Defendants' agreement with their schools to fund subprime private student loans that they expected to default as a "loss leader," as described below.

54. Marketing private loans as part of a package deal was appealing to both schools and lenders. For schools, it meant a streamlined way to ensure that the most students could get funding to attend school, boosting enrollment and resulting revenue. For Defendants, it meant securing a greater volume of federally-guaranteed FFELP loans.

55.     FFELP loan volume was valuable to Defendants for two main reasons: (1) FFELP loans made up a much larger part of the market than private loans; and, (2) the government insured almost 100% of the loan's value, allowing Defendants to profit from the interest income generated from the loan without risking financial exposure in the event of default.

56.     Prime private student loan volume was also valuable to Defendants because private student loans typically had significantly higher interest rates than FFELP loans, and those interest rates were not capped.

57.     Subprime private loans, on the other hand, were merely part of a package of student financing presented to colleges to sell to their students. Even though many students defaulted on the subprime loans, the overall loan package was profitable for Defendants and the colleges. Upon information and belief, the subprime loans were a critical tool for Defendants to convince schools to include them on the schools' preferred lender lists.

**B.  Defendants' Subprime Loan Origination**

58.     Defendants offered a variety of subprime loan products designed to extend credit to borrowers whom Defendants would not have otherwise considered for traditional private loan financing, in order to market lucrative complete loan packages to their school-clients.

59.     Defendants did not disclose to borrowers receiving Defendants' private student loans that the loans came from a subprime lending program with a high likelihood of default.

60.     Defendants' subprime products featured high variable interest rates and origination fees. Upon information and belief, in some cases, these interest rates were as high as Prime +9% or +10%.

61.    Upon information and belief, in addition to high interest rates, some of the loans came with origination fees as high as 9%. The origination fee was often added to the principal balance of the loan, which meant Defendants also earned interest on that fee.

62.    If a school's overall "package" of loan products, consisting mostly of federally guaranteed FFELP loans, was profitable, each loan in the package would not itself need to be profitable to benefit Defendants. The unlikelihood of repayment by most of the school's subprime borrowers was only a secondary concern.

63.    As explained further below, Defendants unfairly and deceptively engaged in a series of acts and practices to facilitate originating these subprime loans to many borrowers who had a high likelihood of defaulting.

64.    A 2007 investigation by the U.S. Senate Committee on Health, Education, Labor & Pensions into preferred lending relationships, including Defendants' subprime loan programs, stated in its "Second Report on Marketing in the Federal Family Education Loan Program":

> [Defendants'] calculations…show for Opportunity Loans offered to a particular college an expected default rate of 70%, an expected yield of negative 9%, and an estimated return on equity of negative 3%. Clearly, these funds are considered a marketing expense rather than a profit center….Internal [Defendant] documents show that the company used Opportunity Loan funds as a bargaining chip to trade for expanded [FFELP] market share.[2]

65.    The report also revealed that Defendants' subprime loans were provided to at least one university "as a bargaining chip to trade for expanded [FFELP] market share…" for several years.[3]

66.    Even while Defendants considered altering their subprime lending practices, the associated prime volume that subprime loans generated remained a key consideration.

---

[2] U.S. Senate Health, Education, Labor and Pensions Committee, *Second Report on Marketing in the Federal Family Education Loan Program*, September 4, 2007, at pp. 7-8.
[3] *Id.* at 8.

67.    Upon information and belief, Defendants were aware that an alteration to their subprime lending strategy would represent a threat to their prime private and federal loan volume.

68.    The Commonwealth believes that, after a reasonable opportunity for discovery, the evidence will likely show that Defendants arranged to be presented as the "preferred lender" by schools to subprime private student loan borrowers by using those very borrowers as "bait" and "loss leaders." Thus, this would have been an important or material fact for the borrowers to consider when deciding whether to enter into a loan with Defendants.

### C.  Defendants Loosened Credit Standards to Make Expensive Loans to Students who Could Not Afford Them

69.    Upon information and belief, to offer attractive "packages" to obtain increased FFELP and prime private loan volume, Defendants loosened their credit standards by expanding the required credit criteria downward to provide loan packages to schools which covered subprime student borrowers.

70.    Upon information and belief, although graduation is a key predictor of a student loan borrower's ability to repay a loan, Defendants did not limit lending made to borrowers who had little chance of graduating – and thus repaying their loans – until after 2008, when new regulations limiting preferred lender programs took effect. Defendants instead continued to make subprime loans to borrowers who had little chance of graduating.

71.    Defendants were sued in various capacities for alleged illegal practices, including a lack of appropriate underwriting. One such lawsuit filed in 2009 in the Southern District of New York, *In Re SLM Litigation*, alleged that the then-CEO, Thomas Fitzpatrick, in a 2007 internal executive meeting, summarized Defendants' private education loan underwriting standards by stating, "If the borrower can create condensation on a mirror, they need to get a loan this year."

72.    Upon information and belief, Defendants experienced rapid growth in loan originations from 2000 to 2006, by increases that were driven not by significant increases in lending to students who qualified for traditional "prime" loans but instead by a much higher increase in Defendants' originations to vulnerable subprime borrowers whom Defendants exploited in order to secure lucrative exclusive deals with schools.

73.    Upon information and belief, Defendants saw the most rapid growth in the riskiest category of subprime lending - loans to borrowers who: (1) attended for-profit or non-profit schools with graduation rates less than 50%, (2) had FICO scores of 640 or less, and (3) were charged high interest rates, high fees, or both ("High Risk Loans").

74.    Although borrowers given High Risk Loans over the relevant time period were not told, and had no idea, that they were far more likely to default than pay back their loans, this fact was no secret to Defendants.

75.    The riskiest credit tier of subprime loans that Defendants offered were called Opportunity Loans, referred to in paragraphs 64 above. Upon information and belief, many, but not all, Opportunity Loans fit into the High Risk Loans category described in paragraph 73 above.

76.    The Commonwealth believes that, after a reasonable opportunity for discovery, the evidence will show, *inter alia*, that: (1) there has been a profound impact on the financial lives of borrowers who were sold risky subprime loans by the Defendants; (2) many borrowers have had to delay starting a family; (3) many borrowers have been unable to save for a down payment on a home; and (4) others have not been able to start their own business and actually apply the education for which they borrowed.

**D. Defendants Protected Themselves from High Default Rates while Leaving Borrowers on the Hook**

77.    Although borrowers were fully liable for the repayment of their high cost, high risk, loans, Defendants took steps to further insulate themselves from any risk these defaults presented to the companies, even going beyond their profits from prime, FFELP, and traditional private loans that purportedly made up for the losses incurred by their subprime defaults.

78.    Defendants achieved this by shifting the risk of default losses on particular loans using a variety of tools, including "credit enhancement" or "recourse" arrangements.

79.    Upon information and belief, in a "credit enhancement" scenario, the school took on some of the risk by accepting only a portion of the loan money upfront.

80.    In such a scenario, unbeknownst to the borrower, Defendants made a deal with the borrower's school to cover a portion of the borrower's loan because the Defendants were betting the borrower would not repay it, all the while attempting to collect the full amount from the borrower.

81.    Upon information and belief, Defendants also entered into "recourse agreements" in which some schools agreed to cover a certain percentage of a defaulted loan.

82.    Defendants originated subprime private student loans to gain access to schools' preferred lender lists, which drove Defendants' highly profitable FFELP loan and prime private loan origination business. Defendants loosened their credit standards to give expensive subprime loans to students who could not afford them, leading to extraordinarily high default rates. Defendants knew these loans had a high risk of default, and lost money on many of them, but the overall strategy was highly profitable for Defendants because the subprime loans allowed Defendants to obtain preferred lender status with schools. Their loan defaults harmed countless student borrowers.

83.     Because these loans could carry lengthy amortization periods and often were not dischargeable in bankruptcy, many borrowers in Puerto Rico are still suffering under the burden of these subprime private loans, including through: (1) ongoing interest accruals, including at subprime and/or default interest rates; (2) increased principal amounts due to capitalization of interest from periods of payment default or forbearance; and (3) damage to their credit ratings. These damages to borrowers in Puerto Rico continue to accrue through today.

## II.     Loan Servicing

### A. Defendants Steered Borrowers into Costly Forbearances

84.     Federal student loans for undergraduate education come in two main forms: subsidized loans and unsubsidized loans, both of which are limited in amount. Typically, for subsidized loans, the government pays the interest while the student borrower attends school. For unsubsidized loans, the loan accrues interest even while the student attends school.

85.     Students generally have six months after leaving school before they must begin repaying their loans. At that time, a federal student loan borrower is assigned to or selects a specific repayment plan. Borrowers, however, have the right to change their repayment plan selections at any time, including when they are experiencing financial hardship or distress.

86.     In 2009, the federal government began offering income-driven repayment plans designed to help borrowers manage their student loan debt and make monthly payments more affordable. Most federal loans are eligible for at least one IDR plan.

87.     IDR plans cap borrowers' required monthly payments on federal student loans at an amount intended to be affordable based on income and family size. Monthly payments may be as low as $0 per month in an IDR plan.

88.     In addition to providing a more affordable monthly payment, most IDR plans offer several other benefits for federal student loan borrowers, especially borrowers experiencing long-term financial hardship.

89.     For example, for borrowers with subsidized loans whose monthly payment amount does not fully cover accrued interest, the federal government will pay any remaining unpaid interest that accrues on those loans during the first three consecutive years of enrollment in the IDR plan. This interest subsidy can be a significant benefit to such borrowers because they generally will never have to pay the interest that the government pays in those three years.

90.     And, because that unpaid interest is paid in full by the federal government, it is not added to the principal balance of the loan.

91.     Another benefit available to borrowers who are enrolled in an IDR plan is forgiveness of the remaining balance of their federal loan, either after making 20-25 years of qualifying payments for most IDR plans or 10 years of qualifying payments while working full time for certain employers, under the Public Service Loan Forgiveness program ("PSLF").

92.     Congress created the PSLF to help public servants – such as teachers, first responders, servicemembers, nurses, and other government employees – manage their student loan debt by providing them with loan forgiveness after 10 years of qualifying payments. To qualify, borrowers must make payments under a qualifying repayment plan, while being employed full time in a qualifying public service job. Months during which loans are in forbearance did not originally qualify towards loan forgiveness under PSLF or any other federal loan forgiveness program.

93.     Federal student loans are also generally eligible for forbearance, which is a short-term, temporary postponement of payment. With forbearance, a borrower experiencing financial

hardship or illness may be able to stop making payments or reduce his or her monthly payment for a defined time period, which can be multiple consecutive months. Borrowers may be entitled to multiple forbearances over the course of a loan, up to 36 months in total.[4]

94.    In October 2021, the Education Department announced a limited PSLF waiver that allowed borrowers to receive credit for past periods of repayment that would otherwise not qualify for PSLF, which included credit for certain periods of forbearance and deferment. The opportunity to apply ended on October 31, 2022.

95.    In April 2022, the Education Department announced it was taking steps to fix "longstanding errors" in income-driven repayment and implemented a one-time account adjustment to count certain long-term forbearances and deferment periods (prior to 2013) toward IDR and PSLF forgiveness. This IDR fix only automatically applied to borrowers who were in forbearance consecutively for a minimum of 12 months, or cumulatively for 36 months. The IDR fix also allowed borrowers who did not take advantage of the limited PSLF waiver to enjoy many of the same benefits.

96.    Borrowers who held commercial FFELP loans at the time of the IDR fix would first have to consolidate their loans into Direct Loans prior to the Education Department's implementation of the IDR fix to obtain its benefits. This was also true for the PSLF limited waiver.

97.    Defendants' website states that forbearance is appropriate for borrowers who "are experiencing temporary hardship related to financial difficulties, change in employment, medical expenses, and other situations."

98.    Forbearance is suitable only for borrowers experiencing temporary or short-term financial hardship and distress. Borrowers who enroll in forbearance face significant costs, such

---

[4] In 2020, the government implemented an interest free student loan forbearance due to the COVID-19 emergency. That forbearance is not relevant here.

as the accumulation of unpaid interest and the addition of that unpaid interest to the principal balance.

99.    Given the costs associated with long-term forbearance, a borrower's monthly payment can dramatically increase after the forbearance period ends and over the entire remaining repayment term.

100.    IDR plans enable borrowers to avoid or reduce the costs of forbearance. For borrowers whose financial hardship is not short-term, enrolling in an IDR plan is usually a better option than forbearance.

101.    Defendants have repeatedly encouraged borrowers experiencing financial hardship to contact them for assistance in evaluating the repayment options.

102.    Upon information and belief, beginning in at least July 2011, despite publicly assuring borrowers that it will help them identify and enroll in an appropriate, affordable repayment plan, Defendants have routinely disregarded that commitment and instead steered borrowers experiencing long-term financial hardship into forbearance.

103.    Upon information and belief, Defendants' compensation policies for their customer service representatives have incentivized them to push numerous borrowers to forbearance without adequately exploring IDR plans with those borrowers and, in some cases, without even mentioning IDR plans at all.

104.    Because of the number and complexity of repayment options, a conversation about alternative repayment plans and the borrower's financial situation is often time-consuming.

105.    Upon information and belief, however, Defendants have compensated their customer service personnel, in part, based on average call time – with the goal of shortening the length of the average call. Engaging in lengthy conversations about borrowers' particular financial

situations and trying to determine the IDR plan that is most appropriate for each borrower would have been financially detrimental for those employees.

106.    Because a borrower is required to submit a paper or online application to enroll in an IDR plan, and to include tax documentation with that application, the process of enrolling a borrower in such plans sometimes requires Defendants to have multiple, lengthy conversations with the borrower.

107.    In addition to the initial paperwork required to enroll borrowers in IDR plans, borrowers in IDR plans must complete recertification forms each year to document their income and family size, which are used to adjust the individual borrower's payment amounts. Processing these forms also increases the employee time devoted to borrowers in IDR plans.

108.    In other words, counseling borrowers about and enrolling them in IDR plans is costly and time consuming for Defendants and their employees. In contrast, enrolling a borrower in forbearance can often be completed over the phone, in minutes, without any paperwork.

109.    Defendants' employees have routinely failed to invest the time and effort necessary to help financially distressed borrowers identify and enroll in affordable repayment plans most appropriate for their financial situations.

110.    Upon information and belief, the number of borrowers that Defendants enrolled in forbearance has historically exceeded the number of borrowers enrolled in IDR repayment plans.

111.    Defendants' representatives sometimes initially responded to borrowers' inability to make a payment by placing them in voluntary forbearance without adequately advising them about available IDR plans. Upon information and belief, this occurred even though many borrowers would likely have qualified for a $0 payment in an IDR plan.

112.    By placing IDR borrowers into forbearance before ultimately enrolling them in IDR plans with a $0 payment, Defendants caused the borrowers to have delayed access to the benefits of IDR and to be negatively impacted by consequences of forbearance, including the addition of interest to a loan's principal and lost months that would have otherwise counted toward forgiveness. This may have been avoided had Defendants enrolled borrowers in IDR initially.

113.    Upon information and belief, Defendants also enrolled many borrowers in multiple consecutive forbearances, even though they had clearly demonstrated a long-term inability to repay their loans, rather than the short-term financial hardship appropriate for forbearances.

114.    Enrollment in multiple consecutive forbearances imposed a staggering financial cost on borrowers. For many of these borrowers, had they been enrolled in IDR plans, they would have avoided much or all of their additional charges because the government would have paid the unpaid interest on their subsidized loans during the first three years of enrollment. Even for the unsubsidized loans, for many borrowers, had the borrowers been enrolled in IDR plans, they would have saved on interest charges because interest would not have been capitalized while the borrower maintained continuous enrolment in IDR. In addition, enrolling these borrowers in forbearances instead of IDR plans delayed them from staying on track with monthly payments that would count towards loan forgiveness under PSLF or other forgiveness programs.

115.    The limited PSLF waiver and the IDR fix addressed some, but not all, of these problems.

### *Consumer Example*

116.    A Puerto Rican borrower took out seven federal student loans while attending law school. After he left school in 2011, he initially began repaying his loans. In December 2012, he encountered financial difficulties, and was having trouble making his payments. When he

contacted Defendants to review his options, they steered him into a 6-month forbearance as his only option. He was not informed of his IDR options and only entered into an IDR plan effective July 2018. According to the borrower, enrolling in IDR from the outset would have been a much better option for him in the long term.

**B.  Defendants' Recertification Servicing Failures**

117.    A federal student loan borrower enrolled in an IDR plan must certify his/her income and family size to qualify on an annual basis. The IDR payment amount applies for twelve months, after which the IDR plan and payment amount will expire unless the borrower renews his/her enrollment. To renew the plan, the borrower must "recertify" his/her income and family size by submitting updated information, including documentation of income.

118.    If the twelve-month period expires because the borrower has not timely recertified income and family size, several negative consequences will occur: (1) the borrower's monthly payment amount may immediately increase; (2) any unpaid, accrued interest will be added to the loan principal; (3) for subsidized loans in the first three years of enrollment in an IDR plan, the borrower will lose an interest subsidy from the federal government for each month until the borrower renews his/her enrollment; and (4) for some borrowers who enroll in forbearance when the twelve-month period expires, progress towards loan forgiveness is delayed because the borrower is no longer making qualifying payments that count towards loan forgiveness. These consequences are irreversible.

119.    The IDR fix and PSLF limited waiver discussed above addressed some, but not all, of these issues.

120.    Upon information and belief, when a borrower enrolled in IDR, Defendants sent him or her an "initial disclosure notice" which identified the beginning and end dates of the initial

enrollment in the repayment plan. It also advised borrowers they would be notified in advance of the renewal period but did not indicate any specific renewal deadline.

121.    Upon information and belief, the notice also did not identify any consequences that might result if the borrower attempted to renew by submitting a renewal application, but the application was incorrect or incomplete in some respect or was not submitted in a timely manner.

122.    Since at least January 1, 2010, federal student loan servicers, including Defendants, have been required to send at least one written notice concerning the annual renewal requirements to borrowers in advance of their renewal deadline. Defendants' annual renewal notices for IDR plans sent through U.S. mail initially did not inform borrowers of the actual date by which they had to submit the renewal application to avoid expiration of the twelve-month period during which payment was set at an affordable amount based on the borrower's income and family size.

123.    Borrowers who submitted a renewal application have clearly chosen to renew their enrollment as evidenced by their submission of the application, even if that application was incomplete or inaccurate. But upon information and belief, Defendants' original notice said nothing to warn these borrowers that failing to submit complete and accurate information before the end of the twelve-month period would have essentially the same consequences as if the borrower chose not to renew their enrollment in the IDR plan at all. Those consequences are set forth in paragraph 118 above.

124.    Upon information and belief, for Defendants' federal loan borrowers who consented to receiving electronic communications, Defendants sent electronic renewal notices that could only be accessed by logging into Defendants' online portal – they did not receive a separate notice via U.S. mail.

125.    Upon information and belief, the only step that Defendants took to advise these borrowers of the availability of the electronic notice was to send them an email with a hyperlink to its website. Borrowers would have to log in to find out the purpose and contents of the document.

126.    Upon information and belief, Defendants track the number of borrowers who click on the hyperlink in the emails that Defendants send to them. Thus, Defendants knew or should have known that many borrowers did not view the electronic renewal notices.

127.    Upon information and belief, for many years, the percentage of borrowers who did not timely renew their enrollment in IDR plans regularly exceeded more than half of borrowers. During those years, Defendants were aware that the majority of borrowers were failing to renew their enrollment in IDR plans.

128.    Upon information and belief, more recently, Defendants have made several enhancements to their email that provides access to the electronic renewal notice. These enhancements increased the renewal rate by more than double.

**C.  Defendants' Cosigner Release Misrepresentations**

129.    A cosigner is generally necessary for a borrower to obtain a subprime private student loan, or to obtain that loan with more favorable terms. Once a borrower enters repayment on his or her private student loan with Defendants, after meeting certain eligibility criteria, he or she generally can apply to release the cosigner from the loan.

130.    Upon information and belief, one of the eligibility criteria that Defendants have required private student loan borrowers to meet before they can apply to release a cosigner is to make a minimum number of consecutive, on-time payments consisting of both principal and interest.

131.    Upon information and belief, for some time after January 21, 2014, Defendants required the borrower to make 12 consecutive, on-time principal and interest payments before applying for cosigner release. Prior to January 21, 2014, Defendants required borrowers to make up to 48 consecutive, on-time principal and interest payments before applying for cosigner release.

132.    A borrower will sometimes make a payment that is a multiple of the monthly payment amount due. For example, a borrower whose monthly payment amount due is $100 may choose to pay $200 or $300 instead of $100.

133.    Upon information and belief, when a borrower made such a "multiplier overpayment," Defendants generally applied the payment to satisfy the borrower's current monthly payment due, and then placed the borrower in a "paid ahead" status for the subsequent months that had been satisfied by the excess payment.

134.    For each month the borrower was in a "paid ahead" status on his or her private student loan, Defendants would send the borrower a bill indicating that the payment due for that month was $0 because the borrower was not required to make any payment that month in order to remain current on his or her loan. Thus, there was no "on-time principal and interest payment" that was even due that month.

135.    Upon information and belief, in determining whether a borrower made the minimum number of "consecutive, on-time principal and interest payments" for purposes of a cosigner release, Defendants treated the lack of payment by a borrower in response to a $0 bill as a failure to make a "consecutive, on-time principal and interest payment" that month.

136.    As a result, Defendants reset the borrower's progress towards the "consecutive, on-time principal and interest payments" requirement to zero months.

137.    Based on the plain meaning of "on-time" and "consecutive," Defendants' policy was contrary to its statement to borrowers that they could apply for cosigner release if they made a certain number of "consecutive, on-time principal and interest payments."

138.    Nothing on Defendants' billing statement, their website, nor any other borrower-facing document advised borrowers that making no payment in response to a $0 bill could impact their eligibility for cosigner release.

139.    By resetting borrowers' progress toward the "consecutive, on-time principal and interest payments" requirement to zero months when they submitted no payment in response to a $0 bill because of a previous multiplier overpayment, Defendants delayed cosigner release for borrowers who had already made progress towards its requirements. The Commonwealth believes that, after a reasonable opportunity for discovery, the evidence will show that this had a negative financial impact on a significant number of cosigners.

**D.  Defendants' Repeated Payment Processing Errors**

140.    One of Defendants' primary responsibilities as a student loan servicer is to process payments made by borrowers on their student loan accounts. Upon information and belief, however, for years Defendants did not have adequate processes and procedures in place to sufficiently address certain errors they make in the processing of payments they receive or to prevent errors from recurring.

141.    Payment allocation refers to how a payment is distributed across multiple loans. Payment application refers to how a payment is applied to a specific loan or loans based on the terms of each loan's promissory note.

142.    A significant number of borrowers submit their payments by mailing a check or through an external bill payment system. The Commonwealth believes that, after a reasonable

opportunity for discovery, the evidence will show that many of these borrowers also send written instructions on how they want Defendants to apply or allocate their payments.

143.    Upon information and belief, many borrowers and cosigners, primarily those who pay by mailing a check or through an external bill payment system, have complained that Defendants misallocated or misapplied submitted payments, in contravention to such borrowers' wishes expressed in their written instructions.

144.    Upon information and belief, one source for historical payment processing errors was Defendants' default payment allocation methodology which Defendants did not disclose on any billing statement, promissory note, or printed or online resource available to borrowers. The default allocation methodology varied based on whether the loan was federal or private, as well as whether the borrower submitted an underpayment, overpayment, or an overpayment that was a multiple of the borrower's monthly payment amount due.

145.    Upon information and belief, because Defendants did not initially make their default allocation methodologies clear or public, borrowers generally had no way of knowing in advance how Defendants might allocate payments.

146.    While a borrower or cosigner could submit written instructions with a paper check as to how a payment should be processed, upon information and belief, Defendants' mail reading equipment did not always properly detect the presence of such instructions. Even where the instructions were detected and acted upon by a representative of Defendants, the representative did not always implement the instructions properly. When borrowers who did not use Defendants' online portal to submit payments discovered that their payment processing instructions had not been implemented properly, they would have to call Defendants to fix it.

147.    Errors made by Defendants in the processing of payments have resulted in: (1) borrowers and cosigners incurring improper late fees and increased interest charges, and (2) the furnishing of inaccurate negative information to consumer reporting agencies.

148.    Upon information and belief, these payment processing errors were not isolated events for many borrowers, but rather the same payment processing error recurred time and again, even after borrowers contacted Defendants to correct the error. While Defendants might correct a specific error if a borrower contacted Defendants to report it, if the error was not escalated beyond a first-level customer service representative, Defendants did not necessarily identify and fix the underlying issue causing the error to prevent it from recurring. As a result, some borrowers have suffered the same payment processing error in and over multiple months.

149.    Upon information and belief, Defendants also failed to categorize most non-escalated borrower inquiries about payment processing errors. Defendants, thus, were unable to systematically search and/or aggregate these non-escalated inquiries. As a result, Defendants were unable to effectively understand many of the problems that borrowers were experiencing and take action to prevent these problems from recurring.

**COUNT ONE**
**VIOLATIONS OF THE CFPA**
**FOR LOAN ORIGINATION CONDUCT**

150.    The Commonwealth incorporates the allegations of the foregoing paragraphs as if stated fully herein.

151.    As described above, the Defendants offered or provided to consumers financial products not in conformity with Federal consumer financial law, and otherwise engaged in unfair, deceptive, or abusive acts or practices, by:

a.   Originating risky, expensive, subprime loans to borrowers despite knowing of the high likelihood they would default on those loans, leaving borrowers in debt, for the purpose of gaining access to federal loan volume, while shifting a portion of the default risk to schools by contract;

b.   Failing to adequately inform borrowers experiencing financial distress of the existence of contractual provisions Defendants had with schools to protect themselves from some of the losses they knew were likely to occur due to defaults on risky subprime loans they made to borrower;

c.   Unfairly and deceptively originating risky loans to: (1) borrowers with low credit scores; (2) who were attending schools with low graduation rates; (3) which carried high interest rates and origination fees; (4) which had a high likelihood of default; (5) for which there were no set repayment options for borrowers unable to repay; and (6) for which there was little to no chance borrowers could discharge in bankruptcy;

d.   Failing to disclose to borrowers that it was highly likely the loan that they were taking out to attend schools with low graduation and low gainful employment rates would default; and

e.   Unfairly and deceptively concealing material facts from prospective student loan borrowers, including that: (1) Defendants were being promoted as the "preferred lender" for the subprime borrowers' school due to arrangements that included using subprime borrowers (and their loans) as "bait" and loss leaders; (2) Defendants had entered into credit enhancement arrangements whereby the school funded a portion of the student's loan; (3) Defendants had entered into recourse agreements with

schools pursuant to which the school would cover a portion of Defendants' loss when borrowers defaulted, as Defendants expected; (4) Defendants' lending business model was built around establishing and enhancing relationships with schools by making loans that it believed were more likely than not to default; (5) a majority of students who received certain high risk loans defaulted; and (6) such defaults would harm borrowers' credit scores, making it more difficult for them to get credit and obtain employment.

152.    Defendants took advantage of a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the subprime loans they offered. Therefore, Defendants' acts and practices as set forth herein constitute abusive acts or practices in violations of sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1).

153.    Defendants' acts and practices relating to loan origination also caused, or were likely to cause, substantial consumer injury. This consumer injury was not reasonably avoidable because Defendants failed to disclose material facts regarding the relationship Defendants had with schools to be preferred lenders and that the borrowers were highly likely to default on the subprime loans. The substantial consumer injury caused or likely caused by Defendants offering subprime loans to consumers likely to default was not outweighed by countervailing benefits to consumers or to competition. Therefore, Defendants' acts and practices as set forth herein constitute unfair acts or practices in violations of sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531, 5536(a)(1).

154.    Defendants' misrepresentations and failure to disclose the high likelihood of default on subprime student loans were material and likely to mislead a reasonable federal student loan borrower. Borrowers' interpretation that such loans were not high risk was reasonable. Therefore,

Defendants' misrepresentations and omissions as set forth herein constitute deceptive acts or practices in violation of sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1).

## COUNT TWO
## VIOLATIONS OF THE FAIR COMPETITION ACT
## FOR LOAN ORIGINATION CONDUCT

155.    The Commonwealth incorporates the allegations of the foregoing paragraphs as if stated fully herein.

156.    As described above, the Defendants offered or provided to consumers financial products not in conformity with Federal consumer financial law, and otherwise engaged in unfair, deceptive, or abusive acts or practices, by:

    a.    Originating risky, expensive, subprime loans to borrowers despite knowing of the high likelihood they would default on those loans, leaving borrowers in debt, for the purpose of gaining access to federal loan volume, while shifting a portion of the default risk to schools by contract;

    b.    Failing to adequately inform borrowers experiencing financial distress of the existence of contractual provisions Defendants had with schools to protect themselves from some of the losses they knew were likely to occur due to defaults on risky subprime loans they made to borrowers;

    c.    Unfairly and deceptively originating risky loans to: (1) borrowers with low credit scores; (2) who were attending schools with low graduation rates; (3) which carried high interest rates and origination fees; (4) which had a high likelihood of default; (5) for which there were no set repayment options for borrowers unable to repay; and (6) for which there was little to no chance borrowers could discharge in bankruptcy;

d.  Failing to disclose to borrowers that it was highly likely the loan that they were taking out to attend schools with low graduation and low gainful employment rates would default; and

e.  Unfairly and deceptively concealing material facts from prospective student loan borrowers, including that: (1) Defendants were being promoted as the "preferred lender" for the subprime borrowers' school due to arrangements that included using subprime borrowers (and their loans) as "bait" and loss leaders; (2) Defendants had entered into credit enhancement arrangements whereby the school funded a portion of the student's loan; (3) Defendants had entered into recourse agreements with schools pursuant to which the school would cover a portion of Defendants' loss when borrowers defaulted, as Defendants expected; (4) Defendants' lending business model was built around establishing and enhancing relationships with schools by making loans that it believed were more likely than not to default; (5) a majority of students who received certain high risk loans defaulted; and (6) such defaults would harm borrowers' credit scores, making it more difficult for them to get credit and obtain employment.

157.  Defendants took advantage of a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the subprime loans they offered. The aforesaid acts constitute unfair methods of competition, and unfair or deceptive acts or practices in trade or commerce in violation of the Fair Competition Act, 10 L.P.R.A. § 259.

**COUNT THREE**
**VIOLATIONS OF THE PUERTO RICO CONSUMER PROTECTION ACT**
**FOR LOAN ORIGINATION CONDUCT**

158.    The Commonwealth incorporates the allegations of the foregoing paragraphs as if stated fully herein.

159.    As described above, the Defendants offered or provided to consumers financial products not in conformity with Federal consumer financial law, and otherwise engaged in unfair, deceptive, or abusive acts or practices, by:

   a.    Originating risky, expensive, subprime loans to borrowers despite knowing of the high likelihood they would default on those loans, leaving borrowers in debt, for the purpose of gaining access to federal loan volume, while shifting a portion of the default risk to schools by contract;

   b.    Failing to adequately inform borrowers experiencing financial distress of the existence of contractual provisions Defendants had with schools to protect themselves from some of the losses they knew were likely to occur due to defaults on risky subprime loans they made to borrowers;

   c.    Unfairly and deceptively originating risky loans to: (1) borrowers with low credit scores; (2) who were attending schools with low graduation rates; (3) which carried high interest rates and origination fees; (4) which had a high likelihood of default; (5) for which there were no set repayment options for borrowers unable to repay; and (6) for which there was little to no chance borrowers could discharge in bankruptcy;

d. Failing to disclose to borrowers that it was highly likely the loan that they were taking out to attend schools with low graduation and low gainful employment rates would default; and

e. Unfairly and deceptively concealing material facts from prospective student loan borrowers, including that: (1) Defendants were being promoted as the "preferred lender" for the subprime borrowers' school due to arrangements that included using subprime borrowers (and their loans) as "bait" and loss leaders; (2) Defendants had entered into credit enhancement arrangements whereby the school funded a portion of the student's loan; (3) Defendants had entered into recourse agreements with schools pursuant to which the school would cover a portion of Defendants' loss when borrowers defaulted, as Defendants expected; (4) Defendants' lending business model was built around establishing and enhancing relationships with schools by making loans that it believed were more likely than not to default; (5) a majority of students who received certain high risk loans defaulted; and (6) such defaults would harm borrowers' credit scores, making it more difficult for them to get credit and obtain employment.

160.   Pursuant to 3 L.P.R.A. §341f, "[t]he Secretary [of the Puerto Rico Department of Consumer Affairs ("DACO")] shall have powers and faculties to inspect for the protection of the of the consumer, compliance of the consumer protecting laws under the jurisdiction of other agencies and organizations of the Commonwealth of Puerto Rico, and to refer the complaints and notify the violations to them for proper action."

161.   Pursuant to 3 L.P.R.A. § 341e(f), the Secretary has the power to represent the Puerto Rican consumers before any court, as well as represent the Commonwealth in any hearing,

proceeding or matter that affects or may affect the interests of the Puerto Rican consumer in general.

162.    Pursuant to 3 L.P.R.A. § 341e(l), the Secretary has the power to promote and establish standards for the quality, safety and genuineness in services and in the products for use and consumption, and to require compliance therewith.

163.    The Secretary is empowered to impose fines up to a maximum of ten thousand dollars ($10,000), and may impose fines for violations of Puerto Rico's consumer protection statutes. *See* 3 L.P.R.A. § 341q. Each day that the same violation is incurred shall be deemed as a separate violation. *Id.*

164.    Pursuant to 3 L.P.R.A. § 341r, prohibited acts include the following:

> Every type or kind of act, practice, advertisement or publicity which constitutes or tends to constitute fraud or deceit or misrepresentation of the brand, price, quantity, size, quality, guarantee or wholesomeness of a product, article or service is hereby prohibited.

165.    As described above, Defendants deceived the public, including Puerto Rican citizens and borrowers, by extending subprime loans to borrowers they knew were unlikely to pay them back, and took advantage of the lack of knowledge on behalf of consumers of the product's material risks, costs, or conditions of the loans they offered, in violation of the Puerto Rico Consumer Protection Act.

166.    On behalf of its agencies and organizations, the Commonwealth seeks to recover fines in the amount of $10,000 per day while Defendants were pursuing their illegal loan origination practices.

**COUNT FOUR**
**VIOLATIONS OF THE CFPA**
**FOR STEERING BORROWERS EXPERIENCING LONG-TERM FINANCIAL**
**HARDSHIP INTO COSTLY FORBEARANCES**

167.    The Commonwealth incorporates the allegations of the foregoing paragraphs as if stated fully herein.

168.    As described above, while engaging in trade or commerce within the Commonwealth by steering borrowers suffering long-term financial hardship into forbearance, Defendants:

    a.  Misrepresented, either expressly or by implication, the suitability of certain federal loan repayment options for borrowers struggling with their payments;

    b.  Failed to meaningfully disclose to borrowers struggling to make their payments that the federal government offers IDR plans to help borrowers avoid default;

    c.  Misrepresented that Defendants would work with borrowers struggling to pay their loans, and identify solutions appropriate for borrowers' particular situations, when, in fact, Defendants in many instances did not do so; and

    d.  Continuously offered forbearances to borrowers who demonstrated a long-term inability to repay, when in fact forbearance is intended for a temporary hardship.

169.    Federal student loan borrowers reasonably relied on Defendants to act in the borrowers' interests in advising about options to address their financial situations. As described above, in numerous instances, Defendants took unreasonable advantage of consumers' reasonable reliance on Defendants to act in the consumers' interests. Therefore, Defendants' acts and practices as set forth herein constitute abusive acts or practices in violations of sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1).

170.    Defendants' acts and practices relating to steering borrowers into forbearance caused, or was likely to cause, substantial consumer injury. This consumer injury was not reasonably avoidable because Defendants steered borrowers into forbearance while providing no or inadequate information about alternative repayment plans. The substantial consumer injury caused or likely caused by Defendants' steering of borrowers into forbearance was not outweighed by countervailing benefits to consumers or to competition. Therefore, Defendants' acts and practices as set forth herein constitute unfair acts or practices in violations of sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531, 5536(a)(1).

**COUNT FIVE**
**VIOLATIONS OF THE FAIR COMPETITION ACT**
**FOR STEERING BORROWERS EXPERIENCING LONG-TERM FINANCIAL**
**HARDSHIP INTO COSTLY FORBEARANCES**

171.    The Commonwealth incorporates the allegations of the foregoing paragraphs as if stated fully herein.

172.    As described above, while engaging in trade or commerce within the Commonwealth by steering borrowers suffering long-term financial hardship into forbearance, Defendants:

      a.    Misrepresented, either expressly or by implication, the suitability of certain federal loan repayment options for borrowers struggling with their payments;

      b.    Failed to meaningfully disclose to borrowers struggling to make their payments that the federal government offers IDR plans to help borrowers avoid default;

      c.    Misrepresented that Defendants would work with borrowers struggling to pay their loans, and identify solutions appropriate for borrowers' particular situations, when, in fact, Defendants in many instances did not do so; and

> d.  Continuously offered forbearances to borrowers who demonstrated a long-term inability to repay, when in fact forbearance is intended for a temporary hardship.

173.    The aforesaid acts constitute unfair methods of competition, and unfair or deceptive acts or practices in trade or commerce in violation of the Fair Competition Act, 10 L.P.R.A. § 259.

## COUNT SIX
## VIOLATIONS OF THE PUERTO RICO CONSUMER PROTECTION ACT FOR STEERING BORROWERS EXPERIENCING LONG-TERM FINANCIAL HARDSHIP INTO COSTLY FORBEARANCES

174.    The Commonwealth incorporates the allegations of the foregoing paragraphs as if stated fully herein.

175.    As described above, while engaging in trade or commerce within the Commonwealth by steering borrowers suffering long-term financial hardship into forbearance, Defendants:

> e.  Misrepresented, either expressly or by implication, the suitability of certain federal loan repayment options for borrowers struggling with their payments;

> f.  Failed to meaningfully disclose to borrowers struggling to make their payments that the federal government offers IDR plans to help borrowers avoid default;

> g.  Misrepresented that Defendants would work with borrowers struggling to pay their loans, and identify solutions appropriate for borrowers' particular situations, when, in fact, Defendants in many instances did not do so; and

> h.  Continuously offered forbearances to borrowers who demonstrated a long-term inability to repay, when in fact forbearance is intended for a temporary hardship.

176.    Pursuant to 3 L.P.R.A. §341f, "[t]he Secretary [of the Puerto Rico Department of Consumer Affairs ("DACO")] shall have powers and faculties to inspect for the protection of the of the consumer, compliance of the consumer protecting laws under the jurisdiction of other

agencies and organizations of the Commonwealth of Puerto Rico, and to refer the complaints and notify the violations to them for proper action."

177.    Pursuant to 3 L.P.R.A. § 341e(f), the Secretary has the power to represent the Puerto Rican consumers before any court, as well as represent the Commonwealth in any hearing, proceeding or matter that affects or may affect the interests of the Puerto Rican consumer in general.

178.    Pursuant to 3 L.P.R.A. § 341e(l), the Secretary has the power to promote and establish standards for the quality, safety and genuineness in services and in the products for use and consumption, and to require compliance therewith.

179.    The Secretary is empowered to impose fines up to a maximum of ten thousand dollars ($10,000), and may impose fines for violations of Puerto Rico's consumer protection statutes. *See* 3 L.P.R.A. § 341q. Each day that the same violation is incurred shall be deemed as a separate violation. *Id.*

180.    Pursuant to 3 L.P.R.A. § 341r, prohibited acts include the following:

> Every type or kind of act, practice, advertisement or publicity which constitutes or tends to constitute fraud or deceit or misrepresentation of the brand, price, quantity, size, quality, guarantee or wholesomeness of a product, article or service is hereby prohibited.

181.    As described above, Defendants deceived the public, including Puerto Rican citizens and borrowers, by steering them into forbearances rather than fully disclosing their options for IDR and other appropriate solutions, in violation of the Puerto Rico Consumer Protection Act.

182.    On behalf of its agencies and organizations, the Commonwealth seeks to recover fines in the amount of $10,000 per day while Defendants were improperly steering borrowers into forbearance.

**COUNT SEVEN**
**VIOLATIONS OF THE CFPA**
**FOR SERVICING FAILURES RELATING TO RECERTIFICATION**

183.    The Commonwealth incorporates the allegations of the foregoing paragraphs as if stated fully herein.

184.    As described above, while engaging in trade or commerce within the Commonwealth through servicing student loans requiring recertification in IDR plans, Defendants:

    a.    Failed to disclose a date certain by which a borrower must have submitted materials to recertify an income driven repayment plan;

    b.    Failed to disclose the consequences a borrower would face in failing to submit a timely income driven repayment plan recertification was more than merely a delay in processing, and included the following consequences: (i) the borrower's monthly payment amount would immediately increase from the IDR payment to one that was higher; (ii) a capitalization event of any unpaid interest that had accrued; (iii) the loss of an applicable interest subsidy provided by the federal government for the first three years of enrollment in an IDR plan for each month until the borrower renewed his or her enrollment; and (iv) delayed progress towards loan forgiveness because the borrower was no longer making qualifying payments that counted toward loan forgiveness; and

    c.    Failed to adequately notify borrowers who consented to receive electronic communications of the existence of the renewal notice, because the email Defendants sent to them that purportedly provided such notice included no

information about the purpose or contents of the notice in the subject line or body of the email.

185.    These acts and practices caused or were likely to cause substantial injury to consumers because numerous federal student loan borrowers' affordable income-based payment in the IDR plan expired because of those acts or practices, causing the borrowers to suffer significant negative financial consequences that were not reasonably avoidable. The substantial consumer injury caused or likely to be caused by Defendants' acts and practices relating to renewal of IDR plans was not outweighed by countervailing benefits to consumers or to competition. Therefore, Defendants acts and practices as set forth herein constitute unfair acts or practices in violations of sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1).

**COUNT EIGHT**
**VIOLATIONS OF THE FAIR COMPETITION ACT**
**FOR SERVICING FAILURES RELATING TO RECERTIFICATION**

186.    The Commonwealth incorporates the allegations of the foregoing paragraphs as if stated fully herein.

187.    As described above, while engaging in trade or commerce within the Commonwealth through servicing student loans requiring recertification in IDR plans, Defendants:

  a.    Failed to disclose a date certain by which a borrower must have submitted materials to recertify an income driven repayment plan;

  b.    Failed to disclose the consequences a borrower would face in failing to submit a timely income driven repayment plan recertification was more than merely a delay in processing, and included the following consequences: (i) the borrower's monthly payment amount would immediately increase from the IDR payment to one that

was higher; (ii) a capitalization event of any unpaid interest that had accrued; (iii) the loss of an applicable interest subsidy provided by the federal government for the first three years of enrollment in an IDR plan for each month until the borrower renewed his or her enrollment; and (iv) delayed progress towards loan forgiveness because the borrower was no longer making qualifying payments that counted toward loan forgiveness; and

c.   Failed to adequately notify borrowers who consented to receive electronic communications of the existence of the renewal notice, because the email Defendants sent to them that purportedly provided such notice included no information about the purpose or contents of the notice in the subject line or body of the email.

188.    The aforesaid acts constitute unfair methods of competition, and unfair or deceptive acts or practices in trade or commerce in violation of the Fair Competition Act, 10 L.P.R.A. § 259.

## COUNT NINE
## VIOLATIONS OF THE PUERTO RICO CONSUMER PROTECTION ACT
## FOR SERVICING FAILURES RELATING TO RECERTIFICATION

189.    The Commonwealth incorporates the allegations of the foregoing paragraphs as if stated fully herein.

190.    As described above, while engaging in trade or commerce within the Commonwealth through servicing student loans requiring recertification in IDR plans, Defendants:

a.   Failed to disclose a date certain by which a borrower must have submitted materials to recertify an income driven repayment plan;

b.  Failed to disclose the consequences a borrower would face in failing to submit a timely income driven repayment plan recertification was more than merely a delay in processing, and included the following consequences: (i) the borrower's monthly payment amount would immediately increase from the IDR payment to one that was higher; (ii) a capitalization event of any unpaid interest that had accrued; (iii) the loss of an applicable interest subsidy provided by the federal government for the first three years of enrollment in an IDR plan for each month until the borrower renewed his or her enrollment; and (iv) delayed progress towards loan forgiveness because the borrower was no longer making qualifying payments that counted toward loan forgiveness; and

c.  Failed to adequately notify borrowers who consented to receive electronic communications of the existence of the renewal notice, because the email Defendants sent to them that purportedly provided such notice included no information about the purpose or contents of the notice in the subject line or body of the email.

191.  Pursuant to 3 L.P.R.A. §341f, "[t]he Secretary [of the Puerto Rico Department of Consumer Affairs ("DACO")] shall have powers and faculties to inspect for the protection of the of the consumer, compliance of the consumer protecting laws under the jurisdiction of other agencies and organizations of the Commonwealth of Puerto Rico, and to refer the complaints and notify the violations to them for proper action."

192.  Pursuant to 3 L.P.R.A. § 341e(f), the Secretary has the power to represent the Puerto Rican consumers before any court, as well as represent the Commonwealth in any hearing,

proceeding or matter that affects or may affect the interests of the Puerto Rican consumer in general.

193.    Pursuant to 3 L.P.R.A. § 341e(l), the Secretary has the power to promote and establish standards for the quality, safety and genuineness in services and in the products for use and consumption, and to require compliance therewith.

194.    The Secretary is empowered to impose fines up to a maximum of ten thousand dollars ($10,000), and may impose fines for violations of Puerto Rico's consumer protection statutes. *See* 3 L.P.R.A. § 341q. Each day that the same violation is incurred shall be deemed as a separate violation. *Id.*

195.    Pursuant to 3 L.P.R.A. § 341r, prohibited acts include the following:

> Every type or kind of act, practice, advertisement or publicity which constitutes or tends to constitute fraud or deceit or misrepresentation of the brand, price, quantity, size, quality, guarantee or wholesomeness of a product, article or service is hereby prohibited.

196.    As described above, Defendants deceived the public, including Puerto Rican citizens and borrowers, by failing to disclose key information relating recertification requirements for IDR, in violation of the Puerto Rico Consumer Protection Act.

197.    On behalf of its agencies and organizations, the Commonwealth seeks to recover fines in the amount of $10,000 per day while Defendants were misleading consumers regarding recertification.

## COUNT TEN
## VIOLATIONS OF THE CFPA
## FOR COSIGNER RELEASE MISREPRESENTATIONS

198.    The Commonwealth incorporates the allegations of the foregoing paragraphs as if stated fully herein.

199.   As described above, while engaging in trade or commerce within the Commonwealth through servicing student loans secured by cosigners, Defendants:

a.   Misled borrowers by misrepresenting the consecutive, on-time principal and interest payments requirement for cosigner release, including without limitation the effect of paid-ahead status on satisfying this requirement; and

b.   Created a likelihood of confusion or misunderstanding for borrowers as to the necessary requirements for obtaining a cosigner release.

200.   It was reasonable for borrowers to interpret Defendants' express representation about the "consecutive, on-time principal and interest payments" requirement to mean that a borrower was only required to submit consecutive "on-time principal and interest payments," and not that such payments must be made in consecutive months and even in months when no such payment was due. Defendants' misrepresentations were material and likely to mislead a reasonable federal student loan borrower. Therefore, Defendants' misrepresentations as set forth herein constitute deceptive acts or practices in violation of sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1).

## COUNT ELEVEN
## VIOLATIONS OF THE FAIR COMPETITION ACT
## FOR COSIGNER RELEASE MISREPRESENTATIONS

201.   The Commonwealth incorporates the allegations of the foregoing paragraphs as if stated fully herein.

202.   As described above, while engaging in trade or commerce within the Commonwealth through servicing student loans secured by cosigners, Defendants:

a. Misled borrowers by misrepresenting the consecutive, on-time principal and interest payments requirement for cosigner release, including without limitation the effect of paid-ahead status on satisfying this requirement; and

b. Created a likelihood of confusion or misunderstanding for borrowers as to the necessary requirements for obtaining a cosigner release.

203. The aforesaid acts constitute unfair methods of competition, and unfair or deceptive acts or practices in trade or commerce in violation of the Fair Competition Act, 10 L.P.R.A. § 259.

**COUNT TWELVE**
**VIOLATIONS OF THE PUERTO RICO CONSUMER PROTECTION ACT**
**FOR COSIGNER RELEASE MISREPRESENTATIONS**

204. The Commonwealth incorporates the allegations of the foregoing paragraphs as if stated fully herein.

205. As described above, while engaging in trade or commerce within the Commonwealth through servicing student loans secured by cosigners, Defendants:

a. Misled borrowers by misrepresenting the consecutive, on-time principal and interest payments requirement for cosigner release, including without limitation the effect of paid-ahead status on satisfying this requirement; and

b. Created a likelihood of confusion or misunderstanding for borrowers as to the necessary requirements for obtaining a cosigner release.

206. Pursuant to 3 L.P.R.A. §341f, "[t]he Secretary [of the Puerto Rico Department of Consumer Affairs ("DACO")] shall have powers and faculties to inspect for the protection of the of the consumer, compliance of the consumer protecting laws under the jurisdiction of other agencies and organizations of the Commonwealth of Puerto Rico, and to refer the complaints and notify the violations to them for proper action."

207.    Pursuant to 3 L.P.R.A. § 341e(f), the Secretary has the power to represent the Puerto Rican consumers before any court, as well as represent the Commonwealth in any hearing, proceeding or matter that affects or may affect the interests of the Puerto Rican consumer in general.

208.    Pursuant to 3 L.P.R.A. § 341e(l), the Secretary has the power to promote and establish standards for the quality, safety and genuineness in services and in the products for use and consumption, and to require compliance therewith.

209.    The Secretary is empowered to impose fines up to a maximum of ten thousand dollars ($10,000), and may impose fines for violations of Puerto Rico's consumer protection statutes. *See* 3 L.P.R.A. § 341q. Each day that the same violation is incurred shall be deemed as a separate violation. *Id.*

210.    Pursuant to 3 L.P.R.A. § 341r, prohibited acts include the following:

> Every type or kind of act, practice, advertisement or publicity which constitutes or tends to constitute fraud or deceit or misrepresentation of the brand, price, quantity, size, quality, guarantee or wholesomeness of a product, article or service is hereby prohibited.

211.    As described above, Defendants deceived the public, including Puerto Rican citizens and borrowers, by misleading them regarding what they considered on-time consecutive payments and the requirements to obtain a cosigner release, in violation of the Puerto Rico Consumer Protection Act.

212.    On behalf of its agencies and organizations, the Commonwealth seeks to recover fines in the amount of $10,000 per day while Defendants were misleading consumers regarding the requirements to obtain a cosigner release.

**COUNT THIRTEEN**
**VIOLATIONS OF THE CFPA**
**FOR REPEATED PAYMENT PROCESSING ERRORS**

213.    The Commonwealth incorporates the allegations of the foregoing paragraphs as if stated fully herein.

214.    As described above, while engaging in trade or commerce within the Commonwealth through processing payments by borrowers and/or cosigners toward their student loans, Defendants:

a.    Unfairly made errors, sometimes month after month, in misallocating and misapplying payments made by borrowers;

b.    Failed to implement adequate processes and procedures to prevent the same errors from recurring; and

c.    Misapplied and misallocated borrower payments.

215.    These acts and practices caused or were likely to cause substantial injury to consumers in the form of late fees, interest accrual, and negative credit reporting. These injuries were not reasonably avoidable because consumers had no control over errors, including repeat errors, that Defendants made in the processing of their payment(s). The substantial consumer injury caused or likely to be caused was not outweighed by countervailing benefits to consumers or to competition. Therefore, Defendants' acts and practices as set forth herein constitute unfair acts or practices in violations of sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1).

**COUNT FOURTEEN**
**VIOLATIONS OF THE FAIR COMPETITION ACT**
**FOR REPEATED PAYMENT PROCESSING ERRORS**

216.    The Commonwealth incorporates the allegations of the foregoing paragraphs as if stated fully herein.

217.    As described above, while engaging in trade or commerce within the Commonwealth through processing payments by borrowers and/or cosigners toward their student loans, Defendants:

  a.  Unfairly made errors, sometimes month after month, in misallocating and misapplying payments made by borrowers;

  b.  Failed to implement adequate processes and procedures to prevent the same errors from recurring; and

  c.  Misapplied and misallocated borrower payments.

218.    The aforesaid acts constitute unfair methods of competition, and unfair or deceptive acts or practices in trade or commerce in violation of the Fair Competition Act, 10 L.P.R.A. § 259.

**COUNT FIFTEEN**
**VIOLATIONS OF THE PUERTO RICO CONSUMER PROTECTION ACT**
**FOR REPEATED PAYMENT PROCESSING ERRORS**

219.    The Commonwealth incorporates the allegations of the foregoing paragraphs as if stated fully herein.

220.    As described above, while engaging in trade or commerce within the Commonwealth through processing payments by borrowers and/or cosigners toward their student loans, Defendants:

  a.  Unfairly made errors, sometimes month after month, in misallocating and misapplying payments made by borrowers;

b. Failed to implement adequate processes and procedures to prevent the same errors from recurring; and

c. Misapplied and misallocated borrower payments.

221. Pursuant to 3 L.P.R.A. §341f, "[t]he Secretary [of the Puerto Rico Department of Consumer Affairs ("DACO")] shall have powers and faculties to inspect for the protection of the of the consumer, compliance of the consumer protecting laws under the jurisdiction of other agencies and organizations of the Commonwealth of Puerto Rico, and to refer the complaints and notify the violations to them for proper action."

222. Pursuant to 3 L.P.R.A. § 341e(f), the Secretary has the power to represent the Puerto Rican consumers before any court, as well as represent the Commonwealth in any hearing, proceeding or matter that affects or may affect the interests of the Puerto Rican consumer in general.

223. Pursuant to 3 L.P.R.A. § 341e(l), the Secretary has the power to promote and establish standards for the quality, safety and genuineness in services and in the products for use and consumption, and to require compliance therewith.

224. The Secretary is empowered to impose fines up to a maximum of ten thousand dollars ($10,000), and may impose fines for violations of Puerto Rico's consumer protection statutes. *See* 3 L.P.R.A. § 341q. Each day that the same violation is incurred shall be deemed as a separate violation. *Id.*

225. Pursuant to 3 L.P.R.A. § 341r, prohibited acts include the following:

Every type or kind of act, practice, advertisement or publicity which constitutes or tends to constitute fraud or deceit or misrepresentation of the brand, price, quantity, size, quality, guarantee or wholesomeness of a product, article or service is hereby prohibited.

226.    As described above, Defendants deceived the public, including Puerto Rican citizens and borrowers, by misapplying their payments and failing to implement adequate processes to prevent such misapplication, in violation of the Puerto Rico Consumer Protection Act.

227.    On behalf of its agencies and organizations, the Commonwealth seeks to recover fines in the amount of $10,000 per day while Defendants were misapplying consumer payments.

## JURY DEMAND

The Commonwealth demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, the Commonwealth respectfully requests that, after due proceedings are had, the Court issue an Order:

A.    Declaring Defendants' conduct as described herein above to be in violation of the Fair Competition Act, the Puerto Rico Consumer Protection Act, and the CFPA;

B.    Permanently enjoining Defendants and all other persons acting on their behalf, directly or indirectly, from violating the Fair Competition Act, the Puerto Rico Consumer Protection Act, the CFPA, or any other provision of federal consumer financial law, as defined by 12 U.S.C. § 5481(14), and any amendments thereto;

C.    Directing Defendants to make full restitution to all borrowers who have suffered losses as a result of the acts and practices alleged in this Complaint and any other acts or practices proved by the Commonwealth;

D.    Permanently enjoining Defendants from selling, assigning, transferring, conveying, collecting, or causing to be collected (including but not limited to through litigation or judgments) any subprime private student loans that are the subject of this litigation;

E. Directing Defendants to withdraw any judgments, liens, garnishments, claims in bankruptcy, or other legal proceedings that Defendants have initiated or entered against consumers relating to subprime private student loans that are the subject of this litigation;

F. Directing Defendants to cease and desist furnishing any negative credit information to any consumer reporting agency with respect to the subprime private student loans that are the subject of this litigation;

G. If Defendants have furnished such negative credit information to a consumer reporting agency, directing Defendants to instruct the consumer reporting agency to delete all such negative credit information;

H. Directing Defendants to disgorge and forfeit all profits they have derived as a result of the conduct alleged herein;

I. Requiring Defendants to finance the cost of a notice program to borrowers;

J. Directing Defendants to pay to the Commonwealth appropriate civil penalties pursuant to the Fair Competition Act and Puerto Rico Consumer Protection Act;

K. Directing the rescission or reformation of contracts where necessary to redress injury to borrowers;

L. Directing Defendants to pay the Commonwealth's investigative and litigation costs in this matter;

M. Awarding reasonable attorneys' fees; and

N. Awarding any and all other relief as may be just and equitable.

Dated: August 18, 2023

Respectfully submitted,

*/s/ Harold D. Vicente Colon*
Harold D. Vicente-Colón

*/s/ Harold D. Vicente Gonzalez*
Harold D. Vicente Gonzalez
Vicente Law LLC
Capital Center Sur Ph1-1201
239 Arterial Hostos
Hato Rey
Tel. (787) 751-8000
Fax (787) 756-5250
hdvc@vclawpr.com

Jason W. Burge (to be admitted *pro hac vice*)
Kaja S. Elmer (to be admitted *pro hac vice*)
Lara K. Richards (to be admitted *pro hac vice*)
FISHMAN HAYGOOD, LLP
201 St. Charles, 46th Floor
New Orleans, LA 70170
Telephone: (504) 585-5252
Facsimile: (504) 586-5250
jburge@fishmanhaygood.com
kelmer@fishmanhaygood.com
lrichards@fishmanhaygood.com

Lynn E. Swanson (to be admitted *pro hac vice*)
JONES SWANSON HUDDELL LLC
601 Poydras Street, Suite 2655
New Orleans, Louisiana 70130
Telephone: (504) 523-2500
Facsimile: (504) 523-2508
lswanson@jonesswanson.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that I electronically filed the foregoing with the Clerk of Court using the ECF system which sent notification of filing to all counsel of record.

Date:   August 18, 2023                              */s/ Harold D. Vicente Colon*